COMMONWEALTH vs. DENNIS R. CARLSON.

Suffolk.  September 21, 1983. — November 1, 1983.

Present: BROWN, KAPLAN, & GREANEY, JJ.

*Constitutional Law,* Assistance of counsel, Conduct of government agents.
*Practice, Criminal,* Assistance of counsel, Fair trial, Dismissal.

Although State police officers acted improperly when, without notifying
counsel for a defendant charged with unlawfully carrying a firearm
and other offenses, they sought to induce the defendant's cooperation
in an unrelated investigation by promising him assistance in the favor-
able disposition of the firearm charge, their conduct did not, in the cir-
cumstances, require dismissal of the charges against the defendant.
[56-60]

COMPLAINTS received and sworn to in the East Boston
Division of the District Court Department on February 11,
1980.

On transfer to the jury session of the Boston Municipal
Court Department, a motion to dismiss was heard by
*Feeney,* J., and the case was heard by *Glynn,* J.

*Joshua D. Werner,* Assistant District Attorney, for the
Commonwealth.

*Jamie Ann Sabino & Barry Haight,* for the defendant,
submitted a brief.

GREANEY, J.  Following a jury waived trial in the Boston
Municipal Court Department, the defendant, Dennis R.
Carlson, was convicted on complaints charging him with
unlawfully carrying a firearm,[1] G. L. c. 269, § 10(*a*), and
assault by means of a dangerous weapon, G. L. c. 265,
§ 15B.  He was acquitted on a third complaint charging
him with unlawfully discharging a firearm within 500 feet
of a dwelling, G. L. c. 269, § 12E.  Carlson was sentenced

---

[1] I.e., a .22 calibre H & R Sportsman single action nine-shot revolver.

to the minimum mandatory one-year term of imprisonment on the carrying charge and to a concurrent one-year term on the assault conviction. The sentences were stayed by the trial judge pending appeal. The defendant contends that the complaints on which he was convicted should have been dismissed pursuant to his pretrial motion which sought their dismissal on the ground that officers of the Massachusetts State police had engaged in improper conduct which abridged his Federal and State constitutional rights. We affirm the judgments of conviction.

The following facts could have been found in connection with the motion.[2] The defendant was arrested by the Winthrop police on February 11, 1980, complained against for

---

[2] Appropriate background may be summarized. On May 8, 1980, in the East Boston District Court, the defendant filed his motion to dismiss. The motion was accompanied by affidavits detailing the facts relied upon in its support, and opposed by a counter-affidavit of Trooper Joseph Flaherty of the Massachusetts State police which set out facts in opposition. A judge of the court denied the motion after an evidentiary hearing without making findings of fact. After transfer of the case to the Boston Municipal Court Department for first instance jury trial, the motion was reheard by a judge of that court who denied it without making findings of fact. The record consists of the motion, the affidavits submitted by the defendant, Trooper Flaherty's counter-affidavit, and the transcript of the trooper's testimony (as the sole witness called by the defendant) at the hearing on the motion held at the East Boston District Court. (The tape recording of the testimony at the hearing on the motion held in the Boston Municipal Court Department is apparently blank, so preparation of a transcript of that hearing is impossible.) It is apparent that the affidavits submitted with the motion by the defendant were filed to comply with the requirements of the last sentence of Mass.R.Crim.P. 13(a)(2), 378 Mass. 871 (1979), and were not considered as evidence. Trooper Flaherty's testimony (together with some undisputed facts) thus constitutes the evidentiary basis for the motion's disposition. See *Commonwealth* v. *Bernier*, 359 Mass. 13, 15-16 (1971), and cases cited. We conclude that the facts necessary to decide the legal questions involved appear with sufficient clarity to permit review without the need to remand the case for preparation of findings of fact. See *Commonwealth* v. *Forrester*, 365 Mass. 37, 44-45 (1974); *Commonwealth* v. *Brady*, 380 Mass. 44, 52 (1980); *Commonwealth* v. *Johnson*, 13 Mass. App. Ct. 905, 906 (1982). In so concluding, we in no way condone the failure of either judge who heard the motion to make detailed subsidiary and ultimate findings of fact and relevant rulings of law.

the firearm and assault complaints, and subsequently arraigned in the East Boston District Court. At his arraignment, he was represented by an attorney. Some time following arraignment, the defendant made arrangements to retain a second attorney to represent him at trial.

At approximately 6:30 A.M. on March 6, 1980, Trooper Flaherty and a second State trooper went to the defendant's home. The sole purpose of their visit was to request that the defendant come to the Attorney General's office for questioning in connection with a pending arson investigation. At that time, the defendant had been under investigation for over a year by the State police as a suspect in certain arsons. Prior to going to the defendant's home, Trooper Flaherty had learned from the Winthrop police that the defendant was before the East Boston District Court on the carrying charge, that Mr. Sylvester had represented him at his arraignment, and that the defendant had posted bail in the amount of $1,000.

At his home, the troopers asked the defendant to go to the Attorney General's office with them. He was told that the police did not have a warrant for his arrest but that one could be obtained should he refuse to go. The defendant was also advised that he was the subject of an investigation for a charge "involv[ing] a ten-year felony," and that "it would be worth [the defendant's] while to hear [the police] out" before talking to anyone. No Miranda warnings were furnished at this initial encounter.

The defendant secured his apartment and drove his own automobile, followed by the State police cruiser, to the Attorney General's office. Immediately upon arrival there, Trooper Flaherty read Miranda warnings to the defendant from a piece of paper. The defendant was then given a waiver form relinquishing those rights to read to himself. He was told to sign the waiver if he wished to talk to the police. The defendant, who Trooper Flaherty testified did not appear to be confused, signed the form.

A two-or-three hour meeting between the defendant and the police followed, during which the police sought to obtain

the defendant's cooperation in the prosecution of other suspects in the arson investigation. In the course of the discussion, the defendant was told by Trooper Flaherty that he probably would be indicted for selling cocaine to an undercover officer as well as for two arsons in which he had admitted his involvement. The defendant was also warned of the maximum penalties for these offenses. At some point the conversation turned to the pending firearm charge in the East Boston District Court. The defendant admitted to the unlawful sale of firearms to an undercover agent (these transactions apparently being unrelated to the pending firearm charge), and he then made other statements concerning the Winthrop incident.[3] During the conversation, Trooper Flaherty advised the defendant that his full cooperation with the State police in pending investigations would lead to favorable recommendations to the trial court assigned to hear any charges that might be brought against him. More directly, the defendant was promised that the assistant district attorney handling the prosecution of the Winthrop incident would be advised by an assistant attorney general that the defendant was assisting the police. This communication would include "recommendations" of an unspecified nature on the carrying charge. This testimony led the judge hearing the motion to comment that these recommendations were likely to "influence the [prosecutor's] recommendation to the [trial] court [on the firearm charge]." At no time during the meeting did the defendant request an opportunity to call a lawyer, and Trooper Flaherty testified that he had no intention of communicating with the defendant's attorney when he initiated contact with the defendant. Nothing was said in the lengthy conversation to disparage any other attorney representing the defendant. At the end of the meeting, the defendant told Trooper Flaherty that he would give serious thought to cooperation. The

---

[3] Trooper Flaherty testified that the defendant had told him that "he [had] got[ten] in a jam in Winthrop" and had "hurt a guy pretty bad," and that "he shot out the windows of his car [so he could] say [that] the guy had shot at him."

defendant subsequently notified his attorney, who filed the instant motion to dismiss.

1. *Propriety of the police conduct.* The defendant argues that the conduct of the State police was improper. We agree.

There is no doubt that the police had the right to initiate discussions with the defendant designed to secure his cooperation in their investigation of crimes which were unrelated to the charges pending in the East Boston District Court, and as to which they had no knowledge, or reason to know, of the defendant's representation by counsel. To deny this right would seriously impede the normal process of investigation. The line between proper and improper conduct was crossed, however, when the police, having reason to know that the defendant faced probable imprisonment on the carrying charge, and that he was represented by counsel, sought to induce cooperation by promising him assistance in the favorable disposition of that offense.

We reject the Commonwealth's arguments suggesting that no impropriety occurred. The Commonwealth concedes that the State police used the carrying charge to gain "leverage" over the defendant. The Commonwealth maintains that the contact was proper because the conversation related solely to the investigation of crimes unrelated to the firearm charge and involved no attempt to plea bargain that offense. We agree that no plea bargaining in the formal sense of the term occurred. Nevertheless (and contrary to the major premise of the Commonwealth's argument), there is little doubt that the immediate urgency of the firearm charge[4] became the focal point of a concerted police effort to turn the defendant into an informer. The vice lies not in the police meeting with the defendant to discuss subjects unrelated to the firearm charge, but in the use of that charge, without notifying counsel, as a stimulus to secure cooperation. We conclude that the police should not have

---

[4] As will be explained later in this opinion, Carlson's position on the firearm charge was virtually hopeless.

conversed with the defendant about the firearm charge without the knowledge and permission of his counsel. See and compare the facts in *United States* v. *Morrison,* 449 U.S. 361, 362-363 (1981); *Commonwealth* v. *Cinelli,* 389 Mass. 197, 207-208 (1983); *Commonwealth* v. *Sherman,* 389 Mass. 287, 288-290 (1983).

2. *Should the complaints be dismissed?* The defendant argues that the two complaints on which he was convicted should be dismissed in accordance with the reasoning in *Commonwealth* v. *Manning,* 373 Mass. 438 (1977). We disagree.

In *Manning,* the Supreme Judicial Court ordered the dismissal of complaints when it was shown that government agents had engaged in a deliberate and debilitating attack on the relationship between Manning and his lawyer in order to persuade Manning to abandon his reliance on counsel and to cooperate in their investigation. The scope of the *Manning* rule was subsequently discussed at some length in *Commonwealth* v. *Cinelli, supra,* a case which also involved improper conversations between government agents and a defendant known to be represented by counsel. The *Cinelli* opinion makes it plain that dismissal of charges is a remedy which infringes drastically on the public interest in bringing accused persons to justice. *Id.* at 210. Hence, *Cinelli* cautions (at 209-210) that dismissal is to be considered the sanction of last resort, justified only in cases of misconduct shown to be "egregious" or likely to pose "a serious threat of prejudice." According to *Cinelli,* the misconduct in *Manning* was egregious, and was aggravated by the difficulty of assessing the precise amount of prejudice suffered by the defendant. *Ibid.*

We think the conduct here falls short of the conduct condemned in *Manning.* The State police were not involved in the prosecution of the charges in the District Court in East Boston and their promise of help on the charges never got down to serious specifics. While the defendant may have thought that he had incriminated himself on the pending charges during his discussion with the police, see note 3,

*supra,* his statements were irrelevant to proving the essential elements of those offenses and probably subject to suppression under the reasoning in *Massiah* v. *United States,* 377 U.S. 201 (1964). We further note that Miranda warnings appear to have been furnished, and that attendant rights appear, to have been waived.[5] After being read his rights, the defendant, unlike the defendant in *Cinelli,* never requested to speak with his lawyer. Finally, we note that there was no disparagement of the defendant's counsel. Evaluating the circumstances in their totality, and without singling out any consideration as more important than any other, we conclude that the government's conduct does not mandate dismissal as a prophylactic remedy.

We turn to the defendant's final point. He argues that the police conduct resulted in prejudice, or a substantial threat of prejudice, in his defense of the firearm and assault charges. He contends — on the question of interference with counsel — that fear of retaliation by the police if he did not cooperate prevented him from being "open" with his attorney and handicapped his lawyer's preparation of a defense. He further contends — on the question of abridgement of his right to a fair trial — that the "admissions" he made to the police about the firearm charge precluded an effective trial strategy by keeping him (for fear of impeachment) from taking the stand in his own defense.

The first argument dealing with interference with his attorney-client relationship is devoid of specifics. As the defendant has failed to make any showing that the police conduct had a tangible adverse impact on his relationship with his lawyer, we reject this contention as conjecture.

The second contention receives no support in the record of the trial. At trial, Officer Charles Herbert of the Winthrop police was called as the sole witness. Officer Herbert

---

[5] A motion to suppress any incriminating statements concerning the firearm charge was never made. This observation imports no binding conclusion on any future proceedings brought to suppress any other incriminating statement made during the March 6, 1980, meeting.

testified that about 2:00 A.M. on February 11, 1980, he and his partner were on cruiser patrol in an isolated area of Winthrop when they noticed the defendant get out of a small pickup truck. They then observed the defendant raise a revolver and fire an estimated six rounds into the truck's windshield. When given the order "Freeze, police", the defendant turned and aimed the revolver at Officer Herbert's partner, who fired two rounds over the defendant's head to enforce the police order. The police disarmed the defendant and seized his revolver, still containing three live rounds. The defendant could not produce a license for the handgun. Brief cross-examination of Officer Herbert established the following: that there was no dwelling within 500 feet of the place of the incident (this evidence leading to the defendant's acquittal on the complaint charging a violation of G. L. c. 269, § 12E), that the pickup truck was owned by the defendant, and that the defendant had made no attempt to fire the revolver at the police.

It is evident that the prosecution's case against the defendant on the carrying and assault charges was substantial, and from all that appears, did not depend in any essential respect on testimony from Trooper Flaherty. The strategy apparently followed by the defendant's experienced trial counsel left the carrying charge alone (as virtually indefensible), and instead sought to mitigate the circumstances of the assault and to knock out the charge under G. L. c. 269, § 12E, for failure of proof. Given the hard facts confronting the defendant, this trial strategy worked about as well as could be expected. As previously noted, the so-called "admissions" made by the defendant could not be used by the Commonwealth at trial. We are left with a record which fails to show that the behavior of the police strengthened the prosecution's case against the defendant, or weakened his

position.[6]  We conclude that despite the misconduct the defendant was effectively represented and fairly convicted.[7]

*Judgments affirmed.*

---

[6] We also point out that a claim of prejudice will usually fail if the taint caused by the misconduct can be identified and neutralized by relief appropriate in the circumstances, such as suppression of the evidence obtained as a result of the misconduct.  See, e.g., *Commonwealth* v. *Sherman, supra* at 290-291, 295-296; *United States* v. *Cross,* 638 F.2d 1375, 1378-1379 (5th Cir. 1981).

[7] For the reasons discussed in *Commonwealth* v. *Cinelli, supra* at 209 n.14, we see no basis for relief on the defendant's alternative argument that the police conduct transgressed art. 12 of the *Massachusetts* Declaration of Rights.